

IN RE SUBPOENA TO UNIVERSITY OF )
NORTH CAROLINA AT CHAPEL HILL )
)
_____ )
) **Case No. 1:03MC138**
)
RECORDING INDUSTRY ASSOCIATION OF )
AMERICA, )
)
)
)
)
v. )
)
UNIVERSITY OF NORTH CAROLINA AT )
CHAPEL HILL )
)
)
Defendant. )
_____ )
)
)
IN RE SUBPOENA TO NORTH CAROLINA )
STATE UNIVERSITY )
)
_____ )
) **Case No. 1:03MC139**
)
RECORDING INDUSTRY ASSOCIATION OF )
AMERICA, )
)
Plaintiff, )
)
v. )
)
NORTH CAROLINA STATE UNIVERSITY )
)
Defendant. )
_____ )

### INTERVENOR UNITED STATES OF AMERICA'S OBJECTIONS TO THE MAGISTRATE'S APRIL 14, 2005 ORDER

# TABLE OF CONTENTS

| | | |
|---|---|---|
| Table of Authorities | | ii |
| Introduction | | 1 |
| Statutory Background | | 2 |
| Argument | | 6 |
| I. | The Statutory Text and Language of Section 512(h) Includes ISPs Transmitting Infringing Material | 7 |
| II. | Applying Section 512(h) to All ISPs Is Consistent with the Legislative History of Section 512(h) | 13 |
| Conclusion | | 20 |

i

# TABLE OF AUTHORITIES

## Cases

*ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001) .......................... 3, 6, 7

*BMG Music et al. v. Does 1-203*, No. 04-650, slip op. (E.D. Penn. Mar. 5, 2004) ...................... 15

*Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001) (*en banc*),
   *cert. denied*, 535 U.S. 971 (2002) ......................................................................................... 12

*Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688 (D. Md. 2001),
   *aff'd*, 373 F.3d 544 (4th Cir. 2004) ...................................................................................... 13

*De Wagenknecht v. Stinnes*, 250 F.2d 414 (D.C. Cir. 1957) ......................................................... 19

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ....................................................................................... 18

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ............................................................. 3, 4, 13

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ................................................. 10

*Houston Business Journal, Inc. v. Office of the Comptroller of the Currency*,
   86 F.3d 1208 (D.C. Cir. 1996) ................................................................................................ 19

*In re Application of Aldunate*, 3 F.3d 54 (2d Cir.), cert. denied, 510 U.S. 965 (1993) ................ 19

*In re Charter Communications, Inc., Subpoena Enforcement Matter*,
   393 F.3d 771 (8th Cir. 2005) ............................................................................................. passim

*In re Letter Rogatory*, 42 F.3d 308 (5th Cir. 1995) ...................................................................... 19

*In re Letter Rogatory*, 523 F.2d 562 (6th Cir. 1975) ..................................................................... 20

*In re: Verizon Internet Services, Inc. Subpoena Enforcement Matter*,
   240 F. Supp. 2d 24 (D.D.C.), *rev'd*, 351 F.3d 1229 (D.C. Cir. 2003) ............................. passim

*Interscope Records et al. v. Does 1-25*, No. 6:04-cv-197-Orl-22DAB, Report and
   Recommendation (M.D. Fla. Apr. 1, 2004) ............................................................................ 15

*Johnson v. United States*, 163 Fed. 30 (1st Cir. 1908) .................................................................. 19

*NBC, Inc. v. Copyright Royalty Tribunal*, 848 F.2d 1289 (D.C. Cir. 1988) ................................. 20

ii

*Playboy Enters., Inc. v. Frena*, 839 F. Supp. 1552 (M.D. Fla. 1993).............................................. 18

*Recording Industry Association of America v. Verizon Internet Services*,
   257 F. Supp. 2d 244 (D.D.C. 2003) ("*Verizon II*"), *rev'd on other grounds*,
   351 F.3d 1229 (D.C. Cir. 2003)............................................................................ 5, 10, 19, 20

*Recording Industry Association of America v. Verizon Internet Services, Inc.*,
   351 F.3d 1229 (D.C. Cir. 2003) ("*Verizon*") ...................................................................... passim

*Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.*,
   907 F. Supp. 1361 (N.D. Cal. 1995) ...................................................................................... 18

*Schmuck v. United States*, 489 U.S. 705 (1989) .......................................................................... 12

*Shea ex rel. American reporter v. Reno*, 930 F. Supp. 916 (S.D.N.Y. 1996),
   *aff'd sub nom. Reno v. Shea*, 521 U.S. 1113 (1997)............................................................. 17

*Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417 (1984)................................. 18, 19

*United States v. Elcom*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002)................................................. 3

*United States v. Hutchinson*, 312 U.S. 219 (1941) ...................................................................... 19

*United States v. O'Neil*, 11 F.3d 292 (1st Cir. 1993).................................................................. 12

*United States v. Poindexter*, 293 F.2d 329 (6th Cir. 1961).......................................................... 12

## Statutes

17 U.S.C. § 106.......................................................................................................................... 15

17 U.S.C. § 501............................................................................................................................ 3

17 U.S.C. § 501(a) ...................................................................................................................... 15

17 U.S.C. § 512...................................................................................................................... passim

17 U.S.C. § 512(a) ................................................................................................................. passim

17 U.S.C. § 512(b) ................................................................................................................. passim

17 U.S.C. § 512(b)(2)(E) ............................................................................................................. 8

17 U.S.C. § 512(c) ................................................................................................................. passim

Case 1:03-mc-00139-WLO   Document 28   Filed 04/28/05   Page 4 of 27

17 U.S.C. § 512(c)(3)(A) ............................................................................................... passim

17 U.S.C. § 512(d) ......................................................................................................... passim

17 U.S.C. § 512(d)(3) ............................................................................................................ 8

17 U.S.C. § 512(f) ................................................................................................................. 5

17 U.S.C. § 512(h) ........................................................................................................ passim

17 U.S.C. § 512(h)(1) ....................................................................................................... 5, 7

17 U.S.C. § 512(h)(2) ........................................................................................................... 5

17 U.S.C. § 512(h)(3) ........................................................................................................... 5

17 U.S.C. § 512(h)(4) ...................................................................................................... 5, 16

17 U.S.C. § 512(h)(5) ................................................................................................. 2, 6, 11

17 U.S.C. § 512(h)(6) ........................................................................................................... 6

17 U.S.C. § 512(i) .......................................................................................................... 4, 12

17 U.S.C. § 512(j) ........................................................................................................ 12, 13

17 U.S.C. § 512(k) ..................................................................................................... 7, 9, 17

2 U.S.C. § 388 .................................................................................................................... 19

28 U.S.C. § 1782 .......................................................................................................... 19, 20

28 U.S.C. § 636(b)(1) ........................................................................................................... 1

35 U.S.C. § 24 .................................................................................................................... 19

45 U.S.C. § 157(h) .............................................................................................................. 19

7 U.S.C. § 2354(a) .............................................................................................................. 19

Judiciary Act of 1789, ch. 20, § 30, 1 Stat. 90.................................................................. 20

## Other Authorities

*Electronic Piracy and the No Electronic Theft (NET) Act: Hearing Before the Subcomm. On Courts and Intellectual Property of the Comm. On the Judiciary,* 105th Cong. 17-18 (1997) ........................................................................ 17

H.R. Rep. No. 105-551(I) ........................................................................ 3, 14

H.R. Rep. No. 105-551(II) ........................................................................ passim

S. Rep. No. 105-190 ........................................................................ passim

## Rules

Federal Rule of Civil Procedure 45 ........................................................................ 6, 15

Federal Rule of Civil Procedure 72(b) ........................................................................ 1

## Constitutional Provisions

U.S. Const. art. III ........................................................................ 19, 20

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), Intervenor United States of America respectfully objects to Magistrate Judge Russell A. Eliason's April 14, 2005 Order ("Order") granting the motions to quash filed by Intervenors John Doe and Jane Doe and Defendants University of North Carolina at Chapel Hill ("UNC") and North Carolina State University ("NCSU"). Because the Order is dispositive of the matter, this Court must undertake a *de novo* review of the Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

## INTRODUCTION

Intervenor United States of America hereby respectfully objects to the Order because it concludes that a federal statute, the Digital Millennium Copyright Act ("DMCA"), does not authorize subpoenas issued to service providers engaged in data transmission. Defendants UNC and NCSU are Internet service providers ("ISP" or "ISPs") that received subpoenas served by Plaintiff Recording Industry Association of America, Inc. ("RIAA"), pursuant to 17 U.S.C. § 512(h) of the DMCA, seeking the production of the name, address, telephone number, and e-mail address of Intervenors "John Doe" and "Jane Doe," subscribers using the transmission functions of Defendants' Internet service. Defendants and Intervenors John Doe and Jane Doe moved to quash these subpoenas in their respective cases because they allege, *inter alia*, that § 512(h) does not authorize subpoenas where an ISP is acting as a transmitter of materials – so-called "conduit" ISPs. Defendants' February 4, 2004 "Memorandum of Law in Support of UNC-CH's and NCSU's Objection, Motion to Quash Subpoenas, and Response to RIAA's Opposition to John and Jane Doe's Motions to Quash" at 3-4; John Doe's Nov. 21, 2003 Memorandum in Support of John Doe's "Motion to Quash the Subpoena Issued by RIAA to UNC" at 7-20; John Doe's Dec. 31, 2003 Reply Brief in Support of John Doe's Motion to Quash at 1-3; Jane Doe's Feb. 17, 2004 "Amended Memorandum in Support of the Motion to Quash the Recording Industry of America's Subpoena" at 2-5.

The Magistrate Judge granted these motions and concluded that a subpoena issued pursuant to 17 U.S.C. § 512(h) does not apply to conduit ISPs based on the premise that Plaintiff cannot satisfy § 512(h)'s notice requirement that it identify infringing material "access to which is to be disabled"

1

because a conduit ISP does not store infringing material. *See* Order at 14, 16-17. This conclusion, and the premise upon which it relies, fail for at least four reasons. *First*, as a threshold matter, § 512(h) unambiguously applies to all "service providers," and the DMCA's definition of "service provider" expressly includes conduit ISPs. If Congress' intent was to exclude conduit ISPs, as the Order suggests, Congress could easily have enacted such an exception. *Second*, the express purpose of § 512(h) is to identify copyright infringers, not to force ISPs to disable access to infringing material. Indeed, it is irrelevant whether the service provider is able, or intends, to disable access to the material because service providers must expeditiously disclose to the copyright owner the information required by the subpoena "*regardless of whether the service provider responds to the notification.*" 17 U.S.C. § 512(h)(5) (emphasis added). *Third*, a conduit ISP *can satisfy* § 512(h)'s notice requirement because an ISP can disable access to such infringing material by, for instance, terminating or suspending that subscriber's account. *Fourth*, the interpretation of § 512(h) set forth in the Order would dismantle the *quid pro quo* Congress created in the DMCA when it granted liability protection to ISPs in exchange for their assisting copyright owners in limiting infringement pursuant to § 512(h).

Accordingly, the United States respectfully requests that the Court not adopt the Magistrate's Order and instead uphold the enforcement of the relevant subpoenas.

## STATUTORY BACKGROUND

Congress passed the DMCA in 1998 in furtherance of the 1996 World Intellectual Property Organization ("WIPO") Copyright and Performances and Phonograms Treaties. The DMCA is designed to advance "two important priorities: promoting the continued growth and development of electronic commerce[] and protecting intellectual property rights." H.R. Rep. No. 105-551(II), at 23 (1998). "Although the copyright infringement liability of on-line and Internet service providers (OSPs and ISPs) is not expressly addressed in the actual provisions of the WIPO treaties," Congress was "sympathetic" to the concerns of such service providers "from the standpoint of contributory and vicarious liability." S. Rep. No. 105-190, at 19 (1998). At the same time, Congress was concerned about the ability of copyright

2

owners to protect their creative investments in light of rapid technological innovations on the Internet that make copyright theft easy, virtually instantaneous, and undetectable. *Id.* at 8, 69 ("The DMCA is a product of the Senate Judiciary Committee's recognition that ours is a time of unprecedented challenge to copyright protection.").

Accordingly, Congress amended chapter 5 of the Copyright Act, 17 U.S.C. § 501, *et seq.*, to create a new section 512 entitled "Limitations on liability relating to material online" in order to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment" as well as to "provide[] greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." S. Rep. No. 105-190, at 20; *see ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (same); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (same).[1] Indeed, courts have confirmed that Congress had two purposes in mind when it enacted Section 512: (1) to limit the liability of Internet service providers for acts of copyright infringement by customers who are using the providers' systems or networks and (2) to assist copyright owners to obtain information necessary to protect their copyrights. *See ALS Scan, Inc.*, 239 F.3d at 625; *cf. United States v. Elcom*, 203 F. Supp. 2d 1111, 1124-25 (N.D. Cal. 2002). Congress struck this balance between copyright owners and service providers because Congress recognized that unless copyright owners have the ability to protect their copyrights on the Internet, they will be less likely to make their works available online. *See* S. Rep. No. 105-190, at 8, 9 (Title II of the DMCA, which includes § 512, "reflects 3 months of negotiations . . . among the major copyright owners and the major OSPs and ISPs").

Section 512 contains limitations on the liability of service providers for four general categories of activity set forth in subsections (a) through (d). The statute thereby creates a series of "safe harbors" that

---

[1]  *See also* H.R. Rep. No. 105-551(II), at 49-50 (same), 21 (Congress sought to "balance[] the interests of content owners, on-line and other service providers, and information users in a way that will foster continued development of electronic commerce and the growth of the Internet"); H.R. Rep. No. 105-551(I), at 12 (1998) (Congress enacted safeguards in the DMCA "protecting service providers from lawsuits when they act to assist copyright owners in limiting or preventing infringement").

3

allow service providers to limit their liability for copyright infringement by users if certain conditions under the Act are satisfied. "The limitations in subsections (a) through (d) protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory [copyright] infringement." S. Rep. No. 105-190, at 20. Under the DMCA, an Internet service provider falls within one of these four subsections based on how the allegedly infringing material has interacted with the service provider's system or network. To qualify for a "safe harbor," the service provider must fulfill the conditions under the applicable subsection and the conditions of 17 U.S.C. § 512(i), which include a requirement that ISPs adopt, implement and inform their subscribers of their policy of terminating the accounts of repeat copyright infringers. *Id.* § 512(i)(1)(A); *Ellison*, 357 F.3d at 1080.

For example, subsection (a) provides a safe harbor to an ISP that is "transmitting" infringing materials from one or more of its subscribers, while subsection (c) provides a safe harbor to an ISP where the infringing materials are stored on the ISP's network or system, such as hosting someone's website.[2] 17 U.S.C. § 512(a), (c). To qualify for the subsection (c) safe harbor, the ISP must expeditiously "remove, or disable access to, the material" if the ISP receives notification of the infringing activity from the copyright owner. *Id.* § 512(c)(1)(C).

Subsection (c)(3)(A) provides the requirements a copyright owner must meet for effective notification of copyright infringement under subsection (c). Section 512(c)(3)(A)'s requirements for effective notification of copyright infringement include the requirement that the copyright holder provide to the designated agent of a service provider a written notification that includes: (1) a "signature of a person authorized to act on behalf of the [copyright] owner;" (2) identification of the copyrighted work (or a representative list where multiple works are involved) allegedly infringed; (3) identification of the allegedly infringing material and information to enable the provider to locate the material; (4) information

---

[2]     Subsection (b) covers "system caching," which is the temporary storage of allegedly infringing material on the ISP's system or network, while subsection (d) relates to "information location tools," which refer or link users to an online location having infringing material through the use of "a directory, index, reference, pointer, [] hypertext link" or other information location tool. 17 U.S.C. § 512(b), (d).

4

to permit the provider to contact the complaining party; (5) a statement of good faith belief that the use complained of is unauthorized; and (6) a "statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed." *Id.* § 512(c)(3)(A)(i)-(vi). This notification requirement is located within subsection (c), and there is no similar notification requirement located within subsections (a), (b), or (d) or anywhere else within section 512.

The DMCA also contains a provision in subsection (h) of Section 512 that states that "[a] copyright owner or a person authorized to act on the owner's behalf may request the clerk of any United States district court to issue a subpoena to a service provider for identification of an alleged infringer in accordance with this subsection." *Id.* § 512(h)(1). The clerk "shall expeditiously issue" the subpoena only if it is in proper form,[3] the declaration attached thereto is properly executed,[4] and "the notification filed satisfies the provisions of subsection (c)(3)(A)." *Id.* § 512(h)(4). Any copyright holder who seeks a § 512(h) subpoena based on intentional misrepresentations "shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer." *Id.* § 512(f); *accord Recording Industry Association of America v. Verizon Internet Services*, 257 F. Supp. 2d 244, 263 (D.D.C. 2003) ("*Verizon II*") (same), *rev'd on other grounds*, 351 F.3d 1229 (D.C. Cir. 2003).

The § 512(h) subpoena, once issued, then authorizes and orders the recipient service provider "to expeditiously disclose" information sufficient to identify the alleged infringer. 17 U.S.C. § 512(h)(3).

---

[3]   The requester must present the clerk with a proposed subpoena that "authorize[s] and order[s] the service provider . . . to expeditiously disclose . . . information sufficient to identify the alleged infringer . . . to the extent such information is available to the service provider." *Id.* § 512(h)(2)(B), (h)(3).

[4]   The requester must present the clerk with a sworn declaration that the subpoena is being sought "to obtain the identity of [the] alleged infringer and that such information will only be used for the purpose of protecting rights" under Title 17. *Id.* § 512(h)(2)(C).

5

The service provider, upon receipt of the subpoena, "shall expeditiously disclose" the information required by the subpoena to the copyright owner (or authorized person). *Id.* § 512(h)(5).[5]

## ARGUMENT

### SECTION 512(h) OF THE DMCA APPLIES TO ALL INTERNET SERVICE PROVIDERS, REGARDLESS OF WHETHER THEY ARE ENGAGED IN DATA TRANSMISSION OR DATA STORAGE

The United States respectfully objects to the Order because subpoenas authorized pursuant to 17 U.S.C. § 512(h) apply to all service providers under the DMCA, regardless of the function that the service provider performs. The Order states that § 512(h) only applies to ISPs storing illegal copies of copyrighted works on their servers and not to conduit ISPs. Contrary to this reasoning, however, the DMCA's statutory text provides clear guidance for construing the subpoena authority to apply to *all* service providers under the DMCA, not just those performing storage functions. Further, to the extent it is necessary to resort to the DMCA's legislative history, a review of such history demonstrates that Congress created a *quid pro quo* whereby service providers would receive liability protections in exchange for assisting copyright owners in identifying and dealing with infringers who misuse the service providers' systems. *See ALS Scan*, 239 F.3d at 625 ("The DMCA was enacted both to preserve copyright enforcement on the Internet and to provide immunity to service providers from copyright infringement liability for 'passive,' 'automatic' actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider.").

---

[5] The issuance, delivery and enforcement of subpoenas are to be governed by the provisions of the Federal Rules of Civil Procedure dealing with subpoenas duces tecum. *Id.* § 512(h)(6). Federal Rule of Civil Procedure 45 provides for subpoenas to be issued in the name of the court, and the failure "without adequate excuse" to obey a subpoena may be deemed a contempt of court. Fed. R. Civ. P. 45(a)(1)(A), (e). A person responding to a subpoena may move to quash or modify the subpoena, and if the responding person serves timely written objections to disclosing the information requested by the subpoena, the serving party may not receive the requested information "except pursuant to an order of the court by which the subpoena was issued." Fed. R. Civ. P. 45(c)(2)(B), (3)(A). In the same vein, the court may "protect a person subject to or affected by the subpoena" by quashing or modifying it if a subpoena requires, for example, the disclosure of certain confidential information. Fed. R. Civ. P. 45(c)(3)(B).

6

## I.     THE STATUTORY TEXT AND LANGUAGE OF SECTION 512(h) INCLUDES ISPs TRANSMITTING INFRINGING MATERIAL.

Section 512(h) unambiguously applies to the term "service provider" when it authorizes a copyright owner or its authorized agent to "request the clerk of any United States district court to issue a subpoena to a service provider for identification of an alleged infringer in accordance with this subsection." 17 U.S.C. § 512(h)(1)(A). Section 512(k) defines "service provider" to include all service providers, including conduit ISPs performing the functions described in § 512(a). *Id.* § 512(k); *see ALS Scan,* 239 F.3d at 623 (the DMCA "defines a service provider broadly"). This broad textual reference to "service provider" in § 512(h) therefore includes all ISPs, including those performing transmission functions (such as merely providing Internet and e-mail access) described in § 512(a). *Cf.* S. Rep. No. 105-190, at 154 (the definition of service provider "applies to the term as used in any other subsection of 512"); H.R. Rep. No. 105-551(II), at 64 (definition of "service provider" "includes, for example, services such as providing Internet access, e-mail," etc.).

Relying principally on the D.C. Circuit's opinion in *Recording Industry Association of America v. Verizon Internet Services, Inc.,* 351 F.3d 1229 (D.C. Cir. 2003) ("*Verizon*"), *rev'g* 240 F. Supp. 2d 24 (D.D.C. 2003) ("*Verizon I*"), and the Eighth Circuit's opinion in *In re Charter Communications, Inc., Subpoena Enforcement Matter,* 393 F.3d 771 (8th Cir. 2005) (2-1 decision), the Order states that even if the term "service provider" includes service providers performing functions described in subsection (a), § 512(h)'s application is still limited by its reference to the notification requirement set forth in § 512(c)(3)(A).[6] *E.g.* Order at 13, 14, 16-17. That notification requirement is located in § 512(c), which

---

[6]     The Order also suggests that because § 512(k) provides a separate definition to cover Section 512(a) service providers, "[t]he distinctions made in Section 512(k) gives reason to conclude that the different treatment of Section 512(a) providers in Section 512(h) was intentional." Order at 6 n.2. However, as already noted, no such distinction in treatment between service providers can be found *anywhere* in the text of § 512(h). *Charter,* 393 F.3d at 780 ("Although Charter contends that the subpoena power in the DMCA is limited by the function of the ISP, such a limitation is not to be found in a plain reading of the DMCA.") (Murphy, C.J., dissenting). Further, the fact that a "Section 512(a)" provider is included in the service provider definitions set forth in *both* subsections (k)(1)(A) *and* (k)(1)(B) reinforces the United States' position that § 512(h)(1)'s unqualified reference to "a service provider" must include a "Section 512(a)" conduit ISP. *Compare* Order at 6 n.2 *with* § 512(h)(1) (stating that a copyright

7

describes ISPs that have stored infringing material for others on their systems or networks. Section 512(c)(3)(A) includes the requirement that a copyright owner must identify for the ISP the infringing material "that is to be removed or access to which is to be disabled." 17 U.S.C. § 512(c)(3)(A)(iii). The Order relies on the view of the *Verizon* panel and *Charter* majority that a § 512(c)(3)(A) notice will not be effective when issued to ISPs acting only as conduits to such material because a valid § 512(c)(3)(A) notice must relate to ISPs storing infringing material on its systems. *Verizon*, 351 F.3d at 1237; *Charter*, 393 F.3d at 777. This conclusion is based on the premise that an ISP cannot remove or disable access to infringing material that is not stored on its system. *E.g.*, Order at 7 ("The notification in subsection (c)(3) presumes that the information is stored on a provider's system."); *see also Verizon*, 351 F.3d at 1235, 1237; *Charter*, 393 F.3d at 776-77.

This view, adopted and applied to this case by the Order, that § 512(h)'s reference to the notification requirement in § 512(c)(3)(A) precludes § 512(h)'s application to ISPs performing the transmitting functions described in § 512(a) fails for at least three reasons. *First*, if Congress had intended to exclude ISPs performing a transmission function, Congress easily could have done so without resorting to the Byzantine statutory interpretation adopted by the Order. Indeed, as the D.C. Circuit conceded, the fact that § 512(h) references the notification provision in subsection (c) does not mean that subsection (h) only applies to ISPs described in subsection (c). *Verizon*, 351 F.3d at 1237 ("we agree with the RIAA that Verizon overreaches by claiming the notification described in § 512(c)(3)(A) applies only to the functions identified in § 512(c)"). Indeed, subsection (c)'s notification provision – § 512(c)(3)(A) – is also referenced in subsections (b)(2)(E) and (d)(3) describing ISPs performing neither subsection (a) nor subsection (c) functions. *Verizon*, 351 F.3d at 1237. These references confirm the expectation that the kind of information described in subsection (c)'s notification may be needed in other settings and therefore are not confined to subsection (c). Nevertheless, the D.C. and Eighth Circuits held

---

owner or authorized agent "may request the clerk of any United States district court to issue a subpoena *to a service provider* for identification of an alleged infringer") (emphasis added).

that this result was consistent with their holdings that § 512(h) may not apply to ISPs described under subsection (a) because "ISP activities described in §§ 512(b) and (d) are storage functions. As such, they are, like the ISP activities described in § 512(c) and unlike the transmission functions listed in § 512(a), susceptible to the notice and take down regime of §§ 512(b)-(d)." *Verizon*, 351 F.3d at 1237; *Charter*, 393 F.3d at 777 (same).

This conclusion is flawed, however, because whatever rationale warrants distinguishing among subsections (a) through (d) for purposes of safe harbor liability limitations, there is no corresponding rationale for such distinctions regarding a subpoena power that entails merely identifying infringers. Section 512(h) is written without limitation or restriction as to its application. Nowhere within § 512(h) did Congress draw any distinctions between the functions performed by the ISPs. It is entitled "Subpoena to identify infringer" not "Subpoena to identify infringer where ISPs are performing storage-like functions." Congress could have simply stated that subsection (h) does not apply to subsection (a) ISPs. Congress could even have excluded ISPs engaged in data transmission from § 512(k)'s definition of "service provider." But Congress did not do so. Instead, the subpoena authority in the DMCA is contained in a stand-alone subsection, § 512(h), just as separate from subsection (c) as it is from subsections (a), (b), and (d). If Congress intended to limit § 512(h)'s subpoena authority based on where such information resides or what function the ISP performs, one would expect to see that limitation explicitly spelled out in subsection (h). *Accord Charter*, 393 F.3d at 780 ("If Congress had wanted to limit the type of ISP subject to a statutory subpoena, it could have easily specified that in § 512(h), but it did not.") (Murphy, C.J., dissenting); *Verizon I*, 240 F. Supp. 2d at 33.

*Second*, the express purpose of a § 512(h) subpoena is to identify a copyright infringer, not to force ISPs to remove material or disable access to that material. The Order states that although § 512(h) "concerns itself with obtaining a subpoena to identify an infringer, Congress *for some reason* included in that process the notification provisions of 17 U.S.C. § 512(c)(3)(A)." Order at 12-13 (emphasis added). The Order states that the "reason" it was included in the *subpoena* subsection must be the same "reason"

9

for including it in the *safe harbor* subsections – namely, to allow service providers to protect themselves from infringement liability by removing infringing material or disabling access to it. Order at 13. However, not only do the DMCA's safe harbor and subpoena subsections serve different purposes (and hence are located in different subsections of the statute), but the "reason" for including the notification provision in the subpoena subsection – § 512(h) – is very different from the "reason" for including it in safe harbor subsections.

Section 512(h)'s reference to the § 512(c)(3)(A) notification is simply to the requirement that it identify the infringing material, not that such material be removed or that access to it be denied to avoid liability and thereby create a safe harbor. "Section 512(h), which creates the subpoena power, only references § 512(c)(3)(A) to indicate the kind of information which needs to be given to the clerk to request a subpoena. By referencing the elements of the notification in § 512(c)(3)(A), Congress avoided the necessity of repeating such notice details in § 512(h)." *Charter*, 393 F.3d at 781 (Murphy, C.J., dissenting). Moreover, the "reason" for including the notification requirement in § 512(h) is quite specific: to ensure that a cognizable controversy exists between a copyright owner and a copyright infringer by requiring the copyright owner to supply, as part of its § 512(h) subpoena request, a notice that essentially states a *prima facie* claim for copyright infringement before the clerk will issue the subpoena. *See* 17 U.S.C. § 512(c)(3)(A)(i)-(vi); *Verizon I*, 240 F. Supp. 2d at 40 ("These protections ensure that a service provider will not be forced to disclose its customer's identifying information without a reasonable showing that there has been copyright infringement."); *Verizon II*, 257 F. Supp. 2d at 263 ("to obtain a [§ 512(h)] subpoena, the copyright owner must, in effect, plead a prima facie case of copyright infringement") (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (copyright infringement established upon proof of (1) existence and ownership of a valid copyright and (2) "copying of constituent elements of the work that are original" without the copyright owner's authorization)). As is conceded in the Order, the notification needs to provide sufficient information about the infringer's conduct to form the "basis for the subpoena." Order at 14.

10

In this way, copyright owners requesting § 512(h) subpoenas are seeking information to enable them to enforce their rights against a subscriber committing copyright infringement; it is not for the purpose of forcing ISPs to disable access to the subscriber's infringing material. Thus, because the notification provision of § 512(h) is designed solely to provide information about the subscriber's infringing conduct, not to compel the ISP to disable access to the subscriber's infringing materials, it is irrelevant whether the service provider ultimately is able, or intends, to disable access to the material. *See* 17 U.S.C. § 512(h)(5) ("service provider shall expeditiously disclose to the copyright owner . . . the [identifying] information required by the subpoena, . . . regardless of whether the service provider responds to the notification").

*Third*, even if disabling access to infringing material – not just the identification of such material – is relevant to § 512(h)'s notice requirement, a copyright owner's notification to an ISP acting as a conduit can satisfy § 512(c)(3)(A)(iii). The Order relies on the D.C. and Eighth Circuit conclusions that when an ISP transmits infringing material from one subscriber's computer to another's (rather than the ISP itself storing such material), then it is impossible for the ISP to disable access to the infringing material. *Verizon*, 351 F.3d at 1235; *Charter*, 393 F.3d at 776. Based on this false premise, the Order states that a copyright owner cannot submit a valid notification pursuant to § 512(c)(3)(A) to a conduit ISP (and thus § 512(h) cannot apply to such ISPs) because for a conduit ISP, "[t]here is no stored material to remove or access to disable." Order at 14.

In fact, an ISP *can deny access* to infringing material that resides only on a subscriber's computer and is not stored on an ISP's server. For example, subscribers commit copyright infringement by offering to others for download unauthorized copies of copyrighted material stored on the subscriber's computer without the copyright owner's authority. In fact, this is exactly what the RIAA alleged was done by one of Verizon's Internet subscribers. *Verizon I*, 240 F. Supp. 2d at 26 ("RIAA seeks the identity of an anonymous user of Verizon's service who is alleged to have infringed copyrights with respect to more than 600 songs offered for downloading over the Internet in a single day"). Thus, an ISP can certainly

11

disable access by others to infringing material stored on one of its subscriber's computers by terminating or suspending that subscriber's account. *Accord id.* at 33 n.5 (an ISP "certainly can disable access to the material [on a subscriber's computer] by terminating the account altogether"); *Charter*, 393 F.3d at 781 ("a conduit ISP can indirectly disable access to material by terminating the accounts of an infringing subscriber") (Murphy, C.J., dissenting). In the same vein, to obtain safe harbor protection, the DMCA separately requires ISPs to implement "a policy that provides for termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). Thus, contrary to the premise on which the *Verizon* and *Charter* majority based their conclusions, § 512(c)(3)(A)(iii)'s requirement that a valid notice identify infringing material "access to which is to be disabled" in fact *can be satisfied* where the ISP acts as a conduit, and thus § 512(h) applies equally to ISPs performing storage-like and transmitting functions alike.[7]

---

[7] Although the Order does not address this issue directly, the D.C. Circuit attempted to rebut the *Verizon* district court's reasoning by distinguishing between denying access to infringing material and denying access to a subscriber's account by relying on § 512(j), which is nowhere referenced in § 512(h). *See Verizon*, 351 F.3d at 1235. Section 512(j) specifies the kinds of injunctive relief that can be entered against ISPs that otherwise qualify for limited liability under § 512, and it prescribes, *inter alia*, for an injunction restraining a service provider from providing (1) "access to infringing material or activity" or (2) "access to a subscriber . . . by terminating the accounts of the subscriber." 17 U.S.C. § 512(j)(1)(A)(i), (ii). The D.C. Circuit held that the existence of this distinction, set forth in § 512(j), shows that when Congress refers to disabling access to infringing material in the notice requirement, set forth in § 512(c)(3)(A)(iii), it is not referring to disabling access to the subscriber by terminating his or her account. *Verizon*, 351 F.3d at 1235.

This distinction, however, fails to make a meaningful difference because restricting "access to infringing material" and restricting "access to a subscriber" are overlapping actions, *not* mutually exclusive ones. An ISP can deny "access to infringing material" in many ways, and one way of accomplishing this goal is to deny "access to a subscriber . . . by terminating the accounts of the subscriber." *Accord Verizon I*, 240 F. Supp. 2d at 33 n.5; *Charter*, 393 F.3d at 781 ("the subsection's two categories of material are not mutually exclusive, and a conduit ISP can indirectly disable access to material by terminating the accounts of an infringing subscriber") (Murphy, C.J., dissenting). Congress routinely identifies separate categories of conduct that, though different, nevertheless overlap with one another. *Cf. Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 882 (9th Cir. 2001) (*en banc*) (finding that "there is at least substantial overlap between" two terms used in the same statute and "reject[ing] the interpretation that the difference in the definitions requires us to . . . make the terms mutually exclusive"), *cert. denied*, 535 U.S. 971 (2002); *United States v. O'Neil*, 11 F.3d 292, 296 (1st Cir. 1993) ("The principle that the grant of a greater power includes the grant of a lesser power is a bit of common sense that has been recognized in virtually every legal code from time immemorial."). For instance, it is axiomatic that when Congress defines two separate criminal offenses, it does not mean that the lesser offense is not included within the broader one. *See, e.g., Schmuck v. United States*, 489 U.S. 705 (1989); *United States v. Poindexter*, 293 F.2d 329, 332 (6th Cir. 1961) ("It is like homicide charges in some states. A charge of first degree murder will support a conviction of murder in the second degree or of manslaughter, but an indictment for one of the lesser offenses will not admit of a conviction for a higher one."). Likewise, in this case, one kind of access restriction – an ISP denying "access to the infringing subscriber"

12

Accordingly, the statutory language and structure of § 512 shows that Congress intended § 512(h) to apply to all ISPs, regardless of whether they are engaged in data transmission or data storage.

## II.    APPLYING SECTION 512(h) TO ALL ISPs IS CONSISTENT WITH THE LEGISLATIVE HISTORY OF SECTION 512(h)

Although the statutory language and structure clearly show that Congress intended the DMCA's subpoena provision to apply to all ISPs, the legislative history behind § 512(h) is useful in assessing the scope of the DMCA's subpoena power. *Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 700 (D. Md. 2001) (to the extent the statutory language in the DMCA is unclear, "the legislative history of the DMCA can be useful in fleshing out its meaning given the paucity of precedent interpreting the statute"), *aff'd*, 373 F.3d 544 (4th Cir. 2004); Order at 11-12 (where statutory language is "ambiguous, [the Court] may look to the legislative history to determine Congressional intent"). Indeed, the legislative history of § 512 reinforces the same conclusion mandated by the text of the statute itself – that subpoenas may be issued to any service provider, regardless of whether the service provider is transmitting infringing material or storing it.

The legislative history makes clear that Congress not only sought to limit the liability of ISPs but also intended to assist copyright owners in protecting their copyrights on the Internet. Congress sought to create a *quid pro quo* between copyright owners and ISPs: ISPs would receive liability protections in exchange for assisting copyright owners in identifying and dealing with infringers who misuse the ISPs' systems. *E.g.*, *Ellison*, 357 F.3d at 1076, 1080. Copyright owners would forego pursuing ISPs as liable for contributory or vicarious copyright infringement for the acts of their users if the ISPs would help to identify and act against those infringers. In this way, the DMCA

> preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment. At the same time, it provides greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.

---

– can readily be included in the broader one – denying "access to the infringing material." Thus, nothing in the text of § 512 generally, or in § 512(j) specifically, suggests that an ISP that terminates or suspends a subscriber's account is otherwise failing to disable "access to infringing materials" at the same time.

13

S. Rep. No. 105-190, at 20. *Accord* H.R. Rep. No. 105-551(II), at 21; H.R. Rep. No. 105-551(I), at 11 (noting that the DMCA's remedies "ensur[e] that it is possible for copyright owners to secure the cooperation of those with the capacity to prevent ongoing infringement").

Congress was concerned about the ability of copyright owners to protect their creative investments in light of rapid technological innovations on the Internet that make copyright theft easy, virtually instantaneous, and undetectable. S. Rep. No. 105-190, at 8, 69 ("The DMCA is a product of the Senate Judiciary Committee's recognition that ours is a time of unprecedented challenge to copyright protection."). For this reason, Congress struck this balance between copyright owners and ISPs because Congress recognized that unless copyright owners have the ability to protect their copyrights on the Internet, they will be less likely to make their works available online. *Id.* at 8, 9 (Title II of the DMCA, which includes § 512, "reflects 3 months of negotiations . . . among the major copyright owners and the major OSPs and ISPs"). Thus, Congress sought, through § 512(h), to require ISPs to assist copyright owners in identifying infringers using the ISPs' systems in exchange for liability protection for ISPs set forth in §§ 512(a)-(d). H.R. Rep. No. 105-551(I), at 12 (Congress enacted safeguards in the DMCA "protecting service providers from lawsuits *when they act* to assist copyright owners in limiting or preventing infringement") (emphasis added).

Accordingly, construing § 512(h) to include all ISPs, regardless of whether the function they are performing is data transmission or data storage, enables and reinforces the *quid pro quo* Congress envisioned. The interpretation of § 512(h) set forth in the Order, however, dismantles Congress' carefully tailored *quid pro quo.* That view allows ISPs performing functions described in § 512(a) to reap all the benefits of the DMCA's balance – liability protection – without incurring the corresponding obligation to assist copyright owners identify infringers pursuant to § 512(h). At the same time, the DMCA would become virtually meaningless as a tool to combat copyright infringement because the vast majority of online infringement occurs when ISPs are performing transmission functions. *Verizon I*, 240 F. Supp. 2d

14

at 36 n.8. Excluding conduit ISPs from the DMCA's subpoena authority, "in effect, give[s] Internet copyright infringers shelter from the long arm of the DMCA subpoena power and allow[s] infringement to flourish." *Id.* at 36. Such a result is clearly contrary to Congress' intent to prevent infringement.

In fact, precluding copyright owners from serving subpoenas pursuant to § 512(h) on conduit ISPs undermines the broader enforcement goals of copyright law itself. Section 512 is part of the Copyright Act, which vests copyright owners with, *inter alia*, the exclusive right to reproduce and distribute copyrighted works (*see* 17 U.S.C. § 106), and it entitles such owners to redress infringement of their exclusive rights against "anyone who violates" those rights. *Id.* § 501(a). Although a copyright owner may be able to obtain an anonymous infringer's identity by filing a "John Doe" complaint for infringement and then requesting issuance of a third-party subpoena pursuant to Federal Rule of Civil Procedure 45, such a procedure is inadequate in the context of online infringement where the Internet and the availability of digital versions of copyrighted works make copyright theft easy, virtually instantaneous, and undetectable. *See* S. Rep. No. 105-190, at 1-2, 8 (copyrighted works in digital form "can be copied and distributed worldwide virtually instantaneously" via the Internet), 69; H.R. Rep. No. 105-551(II), at 61; *Verizon I*, 240 F. Supp. 2d at 40 ("Importantly, the time and delay associated with filing complaints and pursuing third-party subpoenas in court would undermine the ability of copyright owners to act quickly to prevent further infringement of their copyrights.").[8]

---

[8]    Since the D.C. Circuit's *Verizon* opinion, copyright owners have been forced to file "John Doe" lawsuits – and request concomitant third-party Rule 45 subpoenas of conduit ISPs – to identify anonymous online infringers using an ISP's transmission functions. Highlighting the inefficiency of this process, at least one federal district judge and one federal magistrate judge have issued opinions barring copyright owners from consolidating "John Doe" defendants in a single lawsuit and ordering severance of the claims against each such defendant. *See, e.g., BMG Music et al. v. Does 1-203,* No. 04-650, slip op. at 2 (E.D. Penn. Mar. 5, 2004); *Interscope Records et al. v. Does 1-25,* No. 6:04-cv-197-Orl-22DAB, Report and Recommendation at 10-11 (M.D. Fla. Apr. 1, 2004), attached as Exhibit 1 to the United States' April 15, 2004 Memorandum of Law Defending the Digital Millennium Copyright Act in *In re Subpoena to North Carolina State University*, No. 03-139.

15

Consistent with Congress' concerns regarding the virtually instantaneous harm that online infringement can cause,[9] Congress authorized federal district court clerks to "expeditiously issue and sign" properly presented subpoenas for delivery to ISPs and, upon receipt of the subpoena, prescribed that ISPs must "expeditiously disclose . . . the information requested by the subpoena, notwithstanding any other provisions of law." *Id.* § 512(h)(4), (5). Congress' command for the expeditious issuance of and compliance with DMCA subpoenas was deliberate, as Congress "intend[ed] that such [subpoena] orders be expeditiously issued" and that "[t]he issuing of the order should be . . . performed quickly for this provision to have its intended effect." H.R. Rep. No. 105-551(II), at 61.

The Order fails to address how the interpretation of § 512(h) set forth therein squares with Congress' clear intent to strike a balance between the interests of ISPs and those of copyright owners. Significantly, the Order offers no logical connection between the line that it draws (applying § 512(h) to all ISPs except those performing functions described in § 512(a)) and the above-referenced objectives Congress sought to achieve through the DMCA. Rather, the Order relies on the D.C. Circuit's (and the *Charter* majority's) view that "P2P data exchange" – "technology allow[ing] individuals to directly locate and obtain files of copyrighted works stored on another person's computer" – "was not contemplated at the time the statute was written." Order at 8, 16; *Verizon*, 351 F.3d at 1238 (finding that Congress was unaware that Internet subscribers "might be able directly to exchange files containing copyrighted material"); *Charter*, 393 F.3d at 773 (same).

The Order's reliance on this erroneous view, however, is misplaced for at least two reasons. *First*, Congress *was* fully aware that Internet users "might be able directly to exchange files containing copyrighted material." In fact, Congress expressly prescribed a safe harbor for those ISPs that permit subscribers "directly to exchange files containing copyrighted material." Congress specifically defined

---

[9]     *See* S. Rep. No. 105-190, at 1-2, 8 (copyrighted works in digital form "can be copied and distributed worldwide virtually instantaneously" via the Internet), 69; H.R. Rep. No. 105-551(II), at 61; *Verizon I*, 240 F. Supp. 2d at 40 ("Importantly, the time and delay associated with filing complaints and pursuing third-party subpoenas in court would undermine the ability of copyright owners to act quickly to prevent further infringement of their copyrights.").

16

§ 512(a) ("conduit") service providers as those "offering the transmission . . . of online communications between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A). In other words, Congress knew that subscribers would be exchanging files and "material" directly over the Internet, and Congress knew that certain service providers (*e.g.*, conduit ISPs) would facilitate that file exchange. *Accord Charter*, 393 F.3d 779 (Murphy, C.J., dissenting).

And although peer-to-peer services were generally unavailable in 1998, Congress nonetheless understood that other data transmission services were already available in the marketplace to allow subscribers to exchange material directly, point-to-point, with the ISP acting purely as a data transmitting conduit. As the *Charter* dissenting opinion observes, "[s]uch programs were already being developed at the time of the congressional hearings *preceding* the passage of the DMCA." 393 F.3d at 779 (emphasis added) (citing *Electronic Piracy and the No Electronic Theft (NET) Act: Hearing Before the Subcomm. On Courts and Intellectual Property of the Comm. On the Judiciary,* 105th Cong. 17-18 (1997) (statement of Deputy Assistant Attorney General Kevin DiGregory about the direct transfer of copyrighted material through electronic bulletin boards, file transfer protocol sites, and e-mail)). For example, electronic mail ("e-mail") was widely available as a service that allowed subscribers to exchange attachments of copyrighted material directly with one another *before* the 1998 enactment of the DMCA, and Congress specifically recognized that a conduit ISP could perform the function of "e-mail" data transmission for its subscribers. H.R. Rep. No. 105-551(II), at 51 (discussing "e-mail transmission" as an example of an activity "in which a service provider plays the role of a 'conduit'"), 64 (definition of "service provider" "includes, for example, services such as providing Internet access, e-mail," etc.). Similarly, subscribers had at their disposal file transfer protocol ("FTP") software, also available before 1998, to make files on one subscriber's computer available for downloading to other subscribers. *See generally Shea ex rel. American reporter v. Reno*, 930 F. Supp. 916, 928 (S.D.N.Y. 1996) (summarizing FTP technology), *aff'd sub nom. Reno v. Shea*, 521 U.S. 1113 (1997). Congress was also aware that Bulletin Board Services

17

("BBS") operated out of people's homes enabled subscribers to make available copyrighted materials from one home computer to another, point-to-point, using an ISP purely as a conduit. *See* S. Rep. No. 105-190 at 19 n.20 (citing *Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.*, 907 F. Supp. 1361, 1365-66 (N.D. Cal. 1995) (finding that defendant operated BBS "out of his home" to make available copyrighted works stored on his home computer available by using service provider's conduit services); *Playboy Enters., Inc. v. Frena*, 839 F. Supp. 1552, 155-56 (M.D. Fla. 1993) (BBS operated from subscriber's home computer made available for downloading copyrighted works to other subscribers using ISP's conduit services)).

Thus, it is immaterial that Congress was unaware of the latest file exchange technology because Congress was already aware when it enacted the DMCA that (1) subscribers could directly exchange copyrighted material stored on their home computers via e-mail or FTP technology or BBS service and (2) ISPs could perform the same data transmission function to facilitate such file exchanges. Indeed, Congress included a safe harbor for conduit ISPs precisely because Congress already understood that subscribers could commit online copyright infringement by directly exchanging copyrighted material using the transmission functions of conduit ISPs like Defendant.

*Second*, whether or not Congress was able to anticipate peer-to-peer software in enacting the DMCA, the Order essentially reads an exception into the DMCA's subpoena provision's application to conduit ISPs to accommodate John Doe's and Jane Doe's alleged use of the latest version of file-exchange software through Defendants' conduit services. Only Congress has the authority, particularly in the area of copyright law, to create such an exception to the DMCA, not the Court. *Eldred v. Ashcroft*, 537 U.S. 186, 204 (2003) ("we defer substantially to Congress" on its exercise of the legislative authority conferred by the Copyright Clause); *Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417, 429 (1984) ("it is Congress that has been assigned the task of defining the scope of the limited monopoly that

18

should be granted to authors").[10] And the Supreme Court has made clear that "[t]he Legislature has the power to decide what the policy of the law shall be, and . . . it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." *United States v. Hutchinson*, 312 U.S. 219, 235 (1941) (quoting *Johnson v. United States*, 163 Fed. 30, 32 (1st Cir. 1908) (Holmes, J.)). In essence, the D.C. Circuit in *Verizon* and the majority in *Charter* violated this directive in concluding that the DMCA's subpoena provision does not apply to conduit ISPs, and the United States respectfully submits that this Court decline the Magistrate Judge's invitation to do the same.[11]

---

[10] As the Supreme Court observed in *Sony Corp.*, "[s]ound, policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably complicated by such new technology." 464 U.S. at 431.

[11] Although the Order speculates regarding whether § 512(h) violates Article III of the United States Constitution without reaching a ruling on this issue, Order at 19-21, 20 n.6, as the United States has consistently made clear, § 512(h) clearly comports with Article III. *See* United States' May 7, 2005 Memorandum of Law in Opposition to John Doe's Motion to Quash at 10-15, filed in *In re Subpoena to University of North Carolina at Chapel Hill*, No. 03-138. Nothing in Article III of the Constitution precludes Congress from authorizing the clerk of a federal Article III court from issuing a subpoena (and enforcing same) unless a case is actually "pending" or "contemplated" in an Article III court. And although the Order questions whether Congress could authorize federal district court clerks to issue subpoenas pursuant to § 512(h), in fact, Congress has enacted a number of statutes authorizing the clerk of an Article III court to issue subpoenas outside a pending Article III controversy. *See, e.g.,* 35 U.S.C. § 24; 7 U.S.C. § 2354(a); 45 U.S.C. § 157(h); 2 U.S.C. § 388. Like § 512(h), all of these statutes authorize a clerk of a United States court to issue a subpoena outside a case or controversy "pending" in an Article III court. *Verizon II*, 257 F. Supp. 2d at 251. The Order attempts to distinguish these statutes by suggesting these statutes do not involve requests for subpoenas by private parties. Order at 20 n.6. However, at least three such statutes expressly operate, as does 17 U.S.C. § 512(h), to authorize federal court clerks to issue subpoenas without a case pending before an Article III judge – thus involving the same level of "judicial review" and "judicial determination" as does § 512(h). *Compare, e.g.,* 35 U.S.C. § 24; 7 U.S.C. § 2354(a); and 45 U.S.C. § 157(h) *with* 17 U.S.C. § 512(h)(1).

Indeed, Congress has even authorized district courts to "order [a person] to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). Significantly, 28 U.S.C. § 1782 authorizes a court to issue compulsory process even when no proceeding is yet pending in a foreign tribunal. *In re Letter Rogatory*, 42 F.3d 308, 310 (5th Cir. 1995) ("Congress abrogated the requirement that the foreign litigation actually be pending before relief could be had under § 1782"); *In re Application of Aldunate*, 3 F.3d 54, 57 (2d Cir.) (same), *cert. denied*, 510 U.S. 965 (1993). The Order states that neither Federal Rule of Civil Procedure 27 nor § 1782(a) authorize the issuance of a subpoena without prior judicial supervision to determine the existence of a justiciable case or controversy. The Order, however, misconstrues the operation of these provisions. Rule 27 does authorize the issuance of a subpoena despite the *lack* of a ripe case or controversy. *E.g. De Wagenknecht v. Stinnes*, 250 F.2d 414, 417 (D.C. Cir. 1957); *accord Houston Business Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208, 1213 (D.C. Cir. 1996). Similarly, pursuant to 28 U.S.C. § 1782(a), Congress makes compulsory process available in situations where there is not, and *never*

19

## CONCLUSION

For the foregoing reasons, Intervenor United States of America respectfully asks that the Court

not adopt the Magistrate's Order, but instead uphold the enforcement of the relevant subpoenas.

Dated: April 27, 2005          Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

ANNA MILLS S. WAGONER
United States Attorney

JOHN STONE (NCSB #8046)
Chief, Civil Division
Assistant United States Attorney

THEODORE C. HIRT
JOHN H. ZACHARIA
Attorneys, Department of Justice
20 Massachusetts Ave., N.W., 7th Floor
Washington, D.C. 20530
Tel.:    (202) 305-2310
Fax:    (202) 616 8470
E-mail:      john.zacharia@usdoj.gov
Attorneys for the United States of America

---

*will be*, a justiciable case or controversy because a proceeding in a foreign or international tribunal will virtually always arise under foreign rather than American law and therefore will not itself be within the jurisdiction of the federal courts. *Accord Verizon II*, 257 F. Supp. 2d at 252 n.10. Thus, if the constitutional theory reflected in the Order (requiring a judicial determination of an existing justiciable case or controversy before an Article III court's clerk may issue a subpoena) were correct, then both Rule 27 – the origins of which trace back to the Judiciary Act of 1789, *see* Judiciary Act of 1789, ch. 20, § 30, 1 Stat. 90 – and 28 U.S.C. § 1782 – the latest in a line of statutes in effect for nearly 150 years, *see In re Letter Rogatory*, 523 F.2d 562 (6th Cir. 1975) – arguably would also be unconstitutional. Accordingly, if Congress has the undisputed authority (without violating Article III) to direct federal district court clerks to issue subpoenas requested by private parties in connection with controversies cognizable before non-Article III administrative and international fora, then Congress certainly has the authority to direct federal district court clerks to issue similar subpoenas related to controversies cognizable before Article III courts – like the potential copyright infringement actions in this case. In any event, § 512(h) does not violate Article III because it expressly relates to a cognizable Article III controversy – a potential copyright infringement action – over which federal courts have exclusive jurisdiction. *See NBC, Inc. v. Copyright Royalty Tribunal*, 848 F.2d 1289, 1295 (D.C. Cir. 1988).

20

# CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2005, a copy of the foregoing "United States'

Memorandum of Law Defending the Digital Millennium Copyright Act" and exhibit attached

thereto were sent by first class mail to:

Donald B. Verrilli, Jr.
Thomas J. Perrelli
Jenner & Block, LLC
601 13th Street, NW, Suite 1200
Washington, D.C. 20005

David Drooz
Office of Legal Affairs
Campus Box 70008
North Carolina State University
Raleigh, N.C. 27695-7008

Michael A. Kornbluth
Fred S. Battaglia, Jr.
The Kornbluth Law Firm
P.O. Box 1346
Durham, NC 27702

Mark Prak
Brooks Pierce McLendon Humphrey & Leonard
Wachovia Capitol Center, Suite 1600
150 Fayetteville Street Mall
Raleigh, NC 27601

Roy Cooper
John P. Scherer II
North Carolina Department of Justice
P.O. Box 629
Raleigh, North Carolina 27602